## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 20-40090-DDC** |
| **SHAWN LYNN PARCELLS,** | |
| **Defendant.** | |

## GOVERNMENT SENTENCING MEMORANDUM

The United States of America submits this memorandum in support of a sentence within the correctly calculated guideline range of 78 to 97 months in prison, followed by three (3) years of supervised release.   Such a sentence would accomplish the sentencing goals of 18 U.S.C. § 3553(a).

**Statement of Facts**

The defendant, Shawn Lynn Parcells, was the owner of National Autopsy Services, LLC, also referred to as National Autopsy and Tissue Recovery Services, and National Forensic Autopsy and Toxicology Services, LLC. (collectively NAS).    The defendant incorporated NAS in 2016.

An autopsy is a postmortem examination of a human body to discover the cause of death or the extent of disease.    Pathology is the branch of medical science that involves the study and diagnosis of disease through the examination of all or parts of the body.    A pathologist is a physician licensed to practice medicine and surgery and qualified to conduct an autopsy.

1

For a physician, board certification indicates that he or she has undertaken education beyond the minimal standards and competency requirements in a chosen specialty.   The American Board of Pathology, a member of the American Board of Medical Specialties, issues primary and subspecialty certificates in pathology.   Such "board certification" requires successful completion of an accredited graduate medical education program in pathology along with a demonstration of knowledge, skills, judgment, and other abilities deemed important for the practice of pathology.

Between 1996 and 2003, the defendant worked as a Pathologist Assistant (PA) for the Jackson County, Missouri's Medical Examiner's Office.   A PA performs tasks during and after an autopsy under the direction and supervision of a pathologist.   Prior to 2010, there was no formal licensing or certification process to become a PA, and the defendant never received certification as a PA.

According to his NAS website, the defendant offered "private autopsy [services], forensic pathology services, and tissue recovery services to families, attorney's (sic) and research institutions throughout the world."   The defendant represented through the NAS website that cases would be handled by a pathologist, and that "[o]ur pathologists are board certified by the American Board of Pathology . . . ."   NAS did not employ any pathologists.

The clients seeking services from NAS were family members of a deceased person.   The clients generally paid a basic fee of $3,000.00 plus expenses up front for a full pathological study and diagnosis as to the family member's cause of death.   These clients executed a contract with NAS called an "Authorization for Autopsy."   Through this contract, the client requested and authorized NAS to perform an autopsy.

Between May 11, 2016, and May 5, 2019, the defendant used NAS to obtain fees from over 350 clients for a completed case, in the total amount of $ $1,170,982.33.   (Exhibit 1.)   In most cases, the defendant failed to provide an authentic completed report.

The defendant's fraudulent conduct included:

- posting on his NAS website that the client's case would be handled by a pathologist when most cases did not involve a pathologist;

- telling clients through his website that NAS would provide a report showing the exact cause of death, when no pathologist provided a medical opinion;

- giving clients the impression that NAS was a large business operation by claiming on his website that NAS had office locations across the United States, when the defendant operated only one morgue facility and a "Corporate Office" in Topeka, Kansas;

- representing to clients through the NAS contract that in exchange for an agreed upon fee NAS would perform an autopsy and a standard case would take 90 to 180 days to complete, yet in most cases, the defendant never completed and provided a final authentic report;

- falsely providing clients reports appeared to include the opinion of a licensed pathologist despite the fact that no pathologist worked on the client's case;

- providing reports to clients that contained an opinion as to cause of death within a certain degree of medical certainty even though the defendant lacked the knowledge, training, and authority to render such an opinion;

- attempting to deter clients from contacting authorities by claiming that he was still working on the case or that he needed additional information, despite having no intention or ability to complete the case;

- misrepresenting his credentials to make it appear the defendant was a Doctor of Philosophy (PhD), a medical doctor (M.D.), or other professional to convince clients he was qualified to conduct autopsies and offer opinions as to cause of death.

A few examples of the defendant's wire fraud scheme are charged in the substantive counts of the Indictment.   These are summarized below:

3

**Count 1 –** The defendant convinced the client he was qualified to conduct an autopsy based on the false credentials the defendant included in his signature block.    The client paid the defendant $5,000.00 and received from the defendant via emailed a copy of the final report. The report included an opinion made "withing a certain degree of medical certainty as a Forensic, Neuro, and Infectious Disease Epidemiology Fellow," and appeared authored by the defendant.    No pathologist participated in this examination or report.

**Count 2 –** The client paid $4,000.00 to the defendant to conduct an autopsy, believing the defendant was a pathologist due to the defendant referring to himself as "Dr. Parcells."    The defendant emailed the final report that included an opinion as to cause of death.    No pathologist participated in this case.

**Count 3 –** The client paid the defendant $2,000.00 for a full autopsy report, yet the defendant never produced any report.

**Count 4 –** The client paid the defendant $4,000.00 to conduct an autopsy.    The defendant falsified an Alaska Death Record Attestation Form so that it appeared it was prepared and signed by a licensed pathologist who stated that his signature on the form was forged.    The forged Attestation was used to issue the death certificate.    In addition, the defendant never produced any report in this case.

**Count 5 –** The client paid the defendant $4,100.00 to conduct a complete autopsy.    The defendant emailed the client a copy of the "Final Report," indicating Dr. A.D. and the defendant as the pathologists on the case.    When interviewed, Dr. A.D. denied any involvement with this case.

**Count 6 –** The client contracted with the defendant for the purpose of conducting a full autopsy on her infant son, who was 48 hours old at the time of his death.   The client paid the defendant $2,350.00 for the service.   During a phone conversation, the defendant represented to the client that he was a pathologist who owned a nationwide private autopsy business.   From April 2018, to early 2019, the client repeatedly requested information from the defendant pertaining to her son's cause of death.   On January 18, 2019, the defendant via text message advised the client that she had a "spontaneous body related abortion."   The defendant never produced a report in this case.

**Count 7 –** The client paid the defendant $2,250.00 for a complete autopsy.   Dr. M.G., a neuropathologist, authored a report of findings pertaining to brain tissue.   The defendant sent the client a final report appearing to be signed by the defendant and Dr. S.P., consulting pathologist.   When interviewed, Dr. M.G. stated he did not author a final opinion as to the cause of death, and Dr. S.P. denied any involvement with this case.

**Count 8 –** The client paid the defendant $3,600.00 for a complete autopsy.   The client received an unsigned final report bearing the defendant's and Dr. A.D.'s names, stating the cause of death. When interviewed, Dr. A.D. denied any involvement in this case.

**Count 9 –** The client paid the defendant $3,399.00 for a full autopsy.   During a phone call, the defendant represented himself as a pathologist, and claimed a pathologist did not need to be a doctor.   The defendant also said that he conducted thousands of autopsies.   The required the defendant to sign a release and indemnification form prior to allowing the defendant to conduct an autopsy at that facility.   The defendant signed the notarized document, "Shawn Lynn Parcells, BS, MSHAPI, PHD-C M.D.," making it appear that he was a doctor.   The defendant

never produced any reports in this case.

**Count 10 –** The client paid the defendant $3,550.00 to conduct a full autopsy.   The defendant sent the client a final report that represented it was authored by the defendant and Dr. A.D. When interviewed, Dr. A.D. denied any involvement in this case.

During his interview with investigators, the defendant admitted that he sometimes sent unfinished reports to families because they wanted something tangible.   The defendant admitted he sent reports titled "final," that were not actually the final report.   The defendant admitted that he sometimes sent reports to families that indicated a consulting pathologist when a pathologist had not actually consulted on the case.

The Kansas Attorney General's Office (KSAG) filed a civil suit against the defendant, which ultimately led to the federal investigation and charges.   At some point in the proceedings handled by the KSAG, the State district court ordered the defendant to turn over any tissue samples still in his possession.   The defendant failed to comply and was held in contempt.   On December 10, 2019, representatives from the KSAG's office seized over 2000 tissue samples from the defendant's "morgue."   Most were improperly stored in mason jars and plastic containers.   More recently, additional tissue samples were recovered from the home of one of the defendant's relatives.

## I.    Application of the Guidelines

A sentencing Court should first correctly calculate the applicable guidelines range, then consider all of the factors under 18 U.S.C. § 3553(a) to determine whether those factors support the sentence requested by a party.   Although the Court may not presume that a sentence within the guideline range is reasonable, the guidelines should be the starting point.   *Gall v. United*

*States*, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007).   In the ordinary case, a sentence within the guideline range will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."   *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007).

Pursuant to the 2021 United States Sentencing Commission Guidelines Manual (U.S.S.G.), the Presentence Investigation Report (PSIR) correctly applied the following calculation to determine the defendant's offense level and guideline range:

| | | |
|---|---|---|
| *2B1.1(a)(1)* | *Base Offense Level* | *7* |
| *2B1.1(b)(1)(H)* | *Loss amount: $1,100,000* | *+14* |
| *2B1.1(b)(2)(A)(i)* | *Offense involved 100 victims* | *+2* |
| *2B1.1(b)(10)* | *the offense otherwise involved sophisticated means* | *+2* |
| *3A1.1(b)(1)* | *the defendant knew or should have known that* | |
| | *a victim of the offense was a vulnerable victim* | *+2* |
| *3A1.1(b)(2)* | *the offense involved a large number of vulnerable* | |
| | *Victims* | *+2* |
| *3B1.3* | *the defendant abused a position of trust* | *+2* |
| *3E1.1(a) & (b)* | *Acceptance of Responsibility* | *-3* |
| *Total offense level* | | *28* |
| *§ 4A1.1* | *Criminal history level: I* | |

With a criminal history of I, the defendant's guideline range after acceptance is 78-97 months.

**Loss and Number of Victims**

The general rule is that loss is the greater of actual loss or intended loss.   U.S.S.G. § 2B1.1(b)(1), comment. note 3(A).   "The court need only make a reasonable estimate of the loss."   *Id*. at note 3(C).   "In a case involving a scheme in which [] services were fraudulently rendered to the victim by persons falsely posing as licensed professionals . . . loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services."   *Id*. at note 3(F)(v)(I).

Generally, loss is to be calculated as the net value of what was taken. *United States v. Gennuso*, 967 F.2d 1460, 1462 (10th Cir.1992).   The net loss rule "merely requires the court to deduct from the loss calculation any value the defendant gave the victim at the time of the fraud." *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998).   In *Janusz*, the court held that the amount the defendant spent, during the scheme to defraud, on his victims' legitimate expenses was properly deducted from the loss calculation.

However, even if some of the defendant's business expenditures were legitimate, if they were "intertwined with and an ingredient of" the defendant's overall scheme then those expenditures "do not become 'legitimate business expenses' simply because other legitimate businesses also incur these expenses." *United States v. Marvin*, 28 F.3d 663, 665 (7th Cir. 1994) (finding where the defendant did not attempt to fulfill his promise to investors, money spent as part of the fraud scheme did not become "legitimate business expenses").   Where "a defendant's business was used to commit wire fraud a defendant is not entitled to credit for the cost of running the business because a defendant should not get a credit for money spent perpetuating the fraud." *United States v. Cusumano*, 2015 WL 10324107, at *8 (N.D. Fla. Dec. 31, 2015), unpublished, citing *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir.1998). "Operating expenses incurred in operating the business . . . should not be credited in the loss calculation because" money "spent as part of [a] fraudulent scheme do[es] not become 'legitimate business expenses' simply because other legitimate businesses also incur these expenses." *United States v. Campbell*, 765 F.3d 1291, 1305–06 (11th Cir. 2014).

In the instant case, investigators calculated loss in the amount of $ $1,166,732.31 based on the total deposits into the defendant's bank accounts between May 11, 2016, and May 5,

2019.   This calculation includes amounts the investigators determined were transactions from victims, including payments using applications such as Square Inc., WePay, and Stripe.   For example, the defendant's bank records showed 99 transactions utilizing Square Inc., which totaled $304,954.42.   The total amount deposited through Square Inc. divided by the total number of transactions resulted in an average amount of $3080.00.   Investigators logically concluded, based on the defendant's business model of charging approximately $3,000.00 per case, that the 99 transactions via Square Inc. represent 99 victims in our case.

According to the guidelines application notes, "the estimated loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . the approximate number of victims multiplied by the average loss to each victim."   U.S.S.G. § 2B1.1, comment. note 3(C)(iv).   Thus, the reasonable estimate of loss is over $1.1 million from 364 victims.

The question then is whether the defendant incurred legitimate expenses that should be credited toward the loss calculation.   The answer to this question is no.   But in any event, investigators deducted from the total deposits those from most law offices and universities.

Moreover, the defendant's expenses were part of his scheme to defraud.   In order to keep the fraud afloat and attract new cases the defendant had to incur some expenses to keep the fraud from being detected.   For example, once the autopsy fee was received, the defendant collected or sent another technician to collect samples.   However, in the vast majority of cases, no pathologist consulted on the case, so the clients never received a qualified opinion as to the cause of death.

9

**Sophisticated Means**

"If . . . the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels. U.S.S.G. § 2B1.1(b)(10)(C).   According to the commentary, "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id*., comment. note 9(B).

In the instant case, the defendant engaged in a wide variety of activity to make his business appear legitimate to potential clients.   For example, the defendant created a website advertising that he offered "private autopsy [services], forensic pathology services, and tissue recovery services to families, attorney's (sic) and research institutions throughout the world." According to the defendant's NAS website, cases would be handled by a pathologist, and stated that "[o]ur pathologists are board certified by the American Board of Pathology . . . "   Yet at no time were any forensic pathologists employed by NAS.   In addition, the website listed the corporate office in Topeka, Kansas, as well as other offices across the United States, when the only office was the corporate office. (Exhibit 2.) These false statements led potential victims to believe that NAS was a nationwide company, as opposed to a single office.

Further, the defendant misrepresented his credentials both in conversations with victims referring to himself as "Dr. Lynn," or a "pathologist" to name a few, in his email signature block by listing a variety of alleged degrees or certifications, and on the fraudulent reports he sent to victims claiming to be, for example, a "Forensic Epidemiology Fellow, Clinical Human Anatomist and Physiologist."   The defendant also misrepresented his credentials to funeral home directors so that he would be allowed to collect his specimens.   The defendant contracted

10

with autopsy technicians who conducted tissue recovery, but for the most part did not engage an expert qualified to render an opinion as to cause of death.   And the defendant operated his business under different names:   National Autopsy Services, LLC, National Autopsy and Tissue Recovery Services, and National Forensic Autopsy and Toxicology Services, LLC.

Although there are no cases dealing with the specific facts of the instant case, there are cases addressing the application of the enhancement in elaborate fraud schemes.   *See United States v. Snow,* 663 F.3d 1156, 1163 (10th Cir.2011) (enhancement applied where the defendant's fraud involved "over forty fraudulent mortgage-related transactions to defraud at least twelve different financial institutions"); *United States v. Weiss,* 630 F.3d 1263 (10th Cir.2010) (enhancement applied where the defendant had engaged in complex financial calculations and generated multiple false credit letters to fraudulently obtain loans for ineligible buyers); *United States v. Cortney,* 76 F.Supp.3d 1267,1271 (D.NM 2014) (enhancement applied to an elaborate mortgage-fraud scheme involving multiple companies, straw buyer).

**Vulnerable Victims and Large Number of Vulnerable Victims**

Section 3A1.1(b)(1) provides that "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels."   Section 3A1.1(b)(2) further provides that "If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by 2 additional levels."

The Application Notes define a vulnerable victim as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental

condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. §
3A1.1, comment. note 2. The Notes provide that "[t]he adjustment would apply, for example, in
a fraud case in which the defendant marketed an ineffective cancer cure." *Id*.

Courts have applied the enhancement to a broad range of fraudulent conduct. *See e.g.,
United States v. Newsom*, 402 F.3d 780, 785 (7th Cir.2005) (applying enhancement to a sleeping
victim); *United States v. Kennedy*, 845 F. App'x 245, 246 (4th Cir. 2021) (unpublished, finding
victims of "fraudulent immigration business were particularly vulnerable because of their
individual difficulties getting into or remaining in the United States"); *United States v.
Chiwocha*, 720 F. App'x 759, 760 (6th Cir. 2018) (unpublished, applying enhancement where a
defendant "targeted low-income neighborhoods" as part of a scheme seeking personal
information to fraudulently apply for unemployment benefits); *United States v. Mendoza*, 262
F.3d 957, 960 (9th Cir.2001) (stating that the application note to § 3A1.1 makes clear that a large
class of potential victims may be particularly vulnerable due to a shared characteristic, such as
cancer).

"In order to classify a victim as vulnerable, the sentencing court must make particularized
findings of vulnerability." *United States v. Brunson*, 54 F.3d 673, 676 (10th Cir.1995)
(quotation marks omitted). "The focus of the inquiry must be on the victim's personal or
individual vulnerability." *Id.*; *United States v. Proffit*, 304 F.3d 1001, 1007 (10th Cir.2002)
("Membership in a class of individuals considered more vulnerable than the average individual is
insufficient standing alone to qualify as a vulnerable victim"); *and see United States v. Creech*,
913 F.2d 780, 781 (10th Cir. 1993) (district court erred in imposing this enhancement in a case
where there was no evidence that the victim's status as a newlywed made him particularly

vulnerable).

In the instant case, the defendant was well aware that the victims were particularly vulnerable and grieving.   The victims all reached out to the defendant because each had lost a loved one and the defendant promised answers to the cause of death.   N.R.'s son passed away approximately 48 hours after his birth in 2018.   N.R. disagreed with the hospital's diagnosis and the medications the hospital gave her son.   N.R. also suspected medical staff of puncturing her son's lung during treatment.   The hospital did not schedule an autopsy.   N.R. contracted with the defendant to obtain a second opinion to pursue a malpractice suit.   The statute of limitations to file a suit passed without N.R. receiving any report from the defendant.   According to the report of her interview, N.R. said, "this man took my money and took my answers from me."

P.P.'s mother died after surgery.   P.P. reported that during her conversation with the defendant he represented himself to be a medical doctor.   The defendant used the name Prof. Lynn. on emails.   When she didn't receive an autopsy report, P.P. tried to determine where or if the autopsy took place to no avail.

There are numerous other similar accounts from victims.   The victims were particularly vulnerable to the defendant's scheme.   Each wanted answers as to the loved one's cause of death and contracted with the defendant to get those answers.   Some received a false report, but numerous others never received any report.   The defendant promised answers to the cause of death of a loved one.   The defendant specifically targeted these individuals by representing on his website that NAS offered "private autopsy [services], forensic pathology services, and tissue recovery services to families, attorney's (sic) and research institutions throughout the world." (Emphasis added.)   The website boasted that NAS served families across the United States and

in some international locations.   However, as some victims discovered, most of the locations across the United States were bogus and were simply a mortuary where the defendant or another pathology technician collected tissue samples.

The defendant's website also claimed that the NAS staff of board-certified Epidemiologists were highly trained, had reviewed thousands of death and medical investigative cases, and testified in multiple states at the State and Federal Court levels.   According to his website, cases would be handled by a pathologist, and that "[o]ur pathologists are board certified by the American Board of Pathology . . . ."

Families paid the defendant's fee expecting to get answers to what happened to a loved one, yet most never received a report or received a fraudulent report.   Many hoped to receive evidence for a wrongful death suit that could no longer be pursued due to the defendant's fraud and delays.   At least one victim sought evidence to dispute that her son committed suicide. Another victim expressed her anger that the defendant would take advantage of people who were already grieving the loss of a loved one.   The defendant made some victims wait almost a year before sending an incomplete or fraudulent report, or no report at all.

Here the victims all reached out to the defendant because the defendant promised answers as to the cause of death.   As noted above, the defendant misled victims as to the size and makeup of his company, NAS.

The truth is that NAS had no pathologists nor "board certified" epidemiologists on staff. At least one was told that her son had committed suicide and sought evidence to dispute that finding.   The mother of a newborn that died after 48 hours said it most succinctly:   the defendant "took my money and my answers from me."   Another victim expressed her anger that

14

the defendant would take advantage of people who were already grieving the loss of a loved one. The defendant took away any chance she had for a wrongful death suit.   The defendant made some victims wait almost a year before sending an incomplete or fraudulent report, or no report at all.

Further, the number of victims of the defendant's offense is clearly a "large number," as anticipated in § 3A1.1(b)(2).   *See United States v. Mazkouri*, 945 F.3d 293, 306 (5th Cir. 2019) (finding that at least 36 nursing home patients constituted a "large number" of vulnerable victims for purposes of § 3A1.1(b)(2)).

**Abuse of a Position of Trust**

This enhancement applies "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.   U.S.S.G. § 3B1.3.   "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."   *Id.* comment. note 1.   "For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."   *Id.*

"'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."   *Id.* at note 4.   The application note provides examples to include doctors and chemists.   *Id.*

The comment provides the example of a physician sexually abusing a patient under the guise of an examinations.   *Id.* at note 3.   This is similar to the defendant's conduct in the instant

case where the defendant misrepresented his credentials and misrepresented the involvement of a

forensic pathologist.   The defendant used his knowledge gained as an autopsy technician to

convince potential clients that he was qualified to produce an autopsy report with a cause of

death.   "This adjustment also applies in a case in which the defendant provides sufficient indicia

to the victim that the defendant legitimately holds a position of private or public trust when, in

fact, the defendant does not."   *Id*.   Specifically, "the adjustment applies in the case of a

defendant who . . . perpetrates a fraud by representing falsely to a patient . . . that the defendant is

a licensed physician."   *Id*.

Here, the defendant held himself out, at a minimum, to be a person authorized to collect

tissue samples, engage consulting pathologists to render a medical opinion, and prepare an

appropriate report in exchange for his contractual fee.   But the defendant fraudulently

represented himself to be a doctor, a pathologist, or a person with similar credentials qualified to

provide a diagnosis.   Even if the defendant had restricted his conduct to that of a pathologist

assistant, he would still possess a skill "not possessed by members of the general public"

requiring "substantial education, training or licensing."

## II.    Sentence the Court should impose in the instant case

In determining the defendant's sentence, the Court must not only correctly calculate the

advisory guideline range but must also consider information specific to the defendant.   *See, Gall*

*v. United States*, 552 U.S. 38, 39 (2007); 18 U.S.C. § 3553.   As such, "it is fair to assume that

[the Guidelines], insofar as practicable, reflect a rough approximation of sentences that might

achieve § 3553(a)'s objectives."   *Rita v. United States*, 551 U.S. 338 (2007); *United States v.*

*Angel-Guzman*, 506 F.3d 1007, 1012 (10th Cir. 2007).   Therefore, after calculating the guideline

16

range, the Court should look to the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, afford adequate deterrence, and protect the public from further crimes of the defendant, and provide the defendant with needed correctional treatment in the most effective manner.

### A.    Nature and circumstances of the offense and history and characteristics of the defendant

This factor justifies the Court imposing a sentence at the mid-range or high end of the advisory guideline range.   The government acknowledges that the defendant's criminal history is not significant.   However, the Court should look to the nature of the offense and the defendant's other conduct in deciding how to weigh this factor.

As noted repeatedly above, the defendant preyed on unsuspecting individuals who trusted him to give them answers as to what happened to their loved ones.   The defendant's conduct cruelly prolonged the pain caused by the unexpected loss of a loved one.   The defendant caused the victims additional mental anguish by making them wait for a report with answers that never materialized.   In fact, the PSIR notes that a departure might be warranted as a result of the defendant's extreme conduct and infliction of psychological injury.   U.S.S.G. §§ 5K2.3, 5K2.8.

In addition, the Court should take note of the defendant's complete failure to comply with conditions of release.   Although this conduct does not rise to an enhancement for obstruction, it is not otherwise taken into consideration in the defendant's guideline calculation.

And the magistrate judge's order setting condition of release was not the only court the defendant chose to ignore.   In the course of the civil litigation brought by the KSAG's Office,

17

the defendant was found in contempt at least once for failing to comply with the order to turn over tissue samples.   Ultimately the KSAG's office seized over 2000 samples from the defendant's morgue.   There was no refrigerated storage at this location.   Subsequent to that seizure, the KSAG's office was informed that additional tissue samples were recovered from the home of one of the defendant's relatives.

> **B.      The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant**

These factors justify the Court imposing a sentence within the advisory guideline range.

The driving force for the guideline calculation of most wire fraud schemes is typically the loss amount.   Although significant here, the loss amount does not adequately reflect the harm from the defendant's conduct.

The defendant's crime is serious.   He took advantage of a large number of individuals. His delays caused several to lose any chance at a malpractice or wrongful death suit.   Many will never get the closure she or he desperately needed.

The Court needs to impose a sentence that will promote respect for the law and deter others from similar conduct.   The defendant has repeatedly failed to show any respect to the courts presiding over his cases.

## III.      Restitution

The Court should order the defendant to pay restitution to the victims listed Paragraph 231 of the PSIR.   This amount should be amended in the event any additional victim submit a request prior to the sentencing date.

## CONCLUSION

For the reasons set forth above, the Court should impose a sentence within the correctly calculated guideline range and impose three (3) years of supervised release.   The Court should further order restitution in the amounts listed in the PSIR.

Respectfully submitted,

DUSTON J. SLINKARD
United States Attorney

*s/Christine E. Kenney*
CHRISTINE E. KENNEY #13542
Assistant United States Attorney
444 S.E. Quincy, Room 290
Topeka, KS   66683
(785) 295-2850

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*s/ Christine E. Kenney*
Christine E. Kenney, #13542
Assistant United States Attorney
444 S.E. Quincy, Suite 290
Topeka, KS 66683
(785) 295-2850
christine.kenney@usdoj.gov

19