### In the United States District Court
### for the District of Kansas

---

**United States of America**,
                    Plaintiff,

v.                                    Case No. 20-40090-DDC

**Shawn Lynn Parcells**,
                    Defendant.

---

### Sentencing Memorandum

---

Shawn Parcells, by and through his attorney, David Magariel, Assistant Federal Public Defender for the District of Kansas, provides the following sentencing memorandum.

This memorandum focuses on the 18 U.S.C. § 3553(a) factors the Court is to consider at sentencing and provides additional argument regarding the pending objections to the PSR. The memo also responds to the two departure factors indicated in the PSR. Because the final sentencing range has not been determined, Mr. Parcells simply requests the Court impose a sentence within the proper sentencing guideline determined by the Court.

### I.    Consideration of 18 U.S.C. § 3553(a) factors

The sentence this Court imposes for Mr. Parcells guilty plea should be "sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a). A review of the § 3553(a) factors support a guideline sentence.

1

A. **The nature and circumstances of the offense and the history and characteristics of Mr. Parcells.**

1. **Nature and circumstances of the offense.**

The offense conduct at issue involves fraud related to Mr. Parcells' business, NAS. Although Mr. Parcells certainly admits that the business engaged in fraud—some aspects of the business were legitimate including the work done by a pathologist early on in the business, Dr. Sibley, work done over an extended period of time related to neuropathology by Dr. Gokden, and the tissue donation work the business did. Mr. Parcells also consulted as an expert on a number of cases.

While it does not excuse his conduct in the case, Mr. Parcells hopes the Court will take into consideration the fact that close in time to when the business started, Mr. Parcells was shot in the foot in a hunting accident and had to undergo seven surgeries on his foot.[1] Because of the complications related to that injury, he was prescribed pain killers over a lengthy period of time. He quickly became addicted to those opioids which caused significant problems in his life, including drug-seeking behaviors. This addiction does not fully explain the fraud he engaged in, but it does help to explain why there were so many delays in getting reports completed.

2. **History and characteristics of Mr. Parcells**

Mr. Parcells is a 43-year-old father of two teenage daughters. He has been married to his wife, Loree, for nearly twenty-years.[2] He is a lifetime resident of Kansas, living most of his life in the Topeka area. Mr. Parcells is a dedicated father

---

1 D.E. 74 at 31 para 184
2 *Id*. at 31 para 182

who has played an important role in the lives of his daughters. In high school, he was an athlete and was the kicker for the Topeka West football team.[3]  He also was a member of the Kansas State football team as a kicker.[4]

Mr. Parcells has been heavily involved in a religious community, both through First Baptist Church in Topeka, Kansas, and at St. Michael the Archangel Catholic Parish in Leawood, Kansas. Mr. Parcells is very close to his family and has been particularly close to his parents. He lost his father while in custody on this case.[5] His father, William Parcells, Jr., worked for the Kansas Department of Transportation as a Pavement Surface Research Engineer for 46 years.[6]

Mr. Parcells has extensive experience working as a Pathologist Assistant. Mr. Parcells' interest in pathology and the medical field began back when he was in high school and has extended over 20 years. In high school, Mr. Parcells gained experience at both KU Med and through the Jackson County Medical Examiner's Office.[7]  That experience extended into college.[8]  Mr. Parcells was featured in an article in the Kansas State Collegian, which recognized his unique experience at such an early age.[9]

---

3  *Id*. at 31 para 181 and 34 para 200
4  *Id*.
5  Topeka Capital Journal, *Life Story: William Howard Parcells, Jr.*, May 24, 2022, available at: https://www.cjonline.com/obituaries/p0210634
6  D.E. 74 at 31 para 180; Kansas Department of Transportation, *Parcells retires from KDOT*, September 20, 2016, available at:
https://www.ksdot.org/Assets/wwwksdotorg/Headquarters/PDF_Files/pressrelease2016/Retirement_Parcells.pdf
7  Exhibit A (Article in the Kansas State Collegian, September 30, 1999); D.E. 74 at 58 para 336
8  *Id*.
9  *Id*.

Mr. Parcells later owned Parcells Family Funeral Service Group from 2006 to 2008. Mr. Parcells worked as an assistant coroner for Jim Garrison, who was the elected coroner for Ray County, Missouri. He worked for Mr. Garrison from January 2009 through December 2012. Mr. Parcells worked with Dr. Edward Friedlander from 2010 through 2014.[10] Mr. Parcells also assisted Dr. George Vandermark with a number of autopsies in 2014.[11] Mr. Parcells previously worked in law enforcement as a Reserve Deputy for the Shawnee County Sheriff's Office.[12]

In 2015, Mr. Parcells was shot in the left foot in a hunting accident.[13] As a result of that injury, Mr. Parcells suffered "a significant loss of bone" to his metatarsal and some of the medial cuneiform.[14] This injury has caused significant problems for Mr. Parcells including a MRSA infection and the need for seven surgeries.[15] Early on, doctors believed Mr. Parcells' injury may have required amputation.[16] As a result of the pain Mr. Parcells suffered from this injury, he was prescribed pain killers, which he later became addicted to.[17] That addiction contributed to the offense conduct as Mr. Parcells addiction has caused him substantial problems including engaging in drug-seeking behaviors, withdrawal symptoms, and significant depression.

---

10  D.E. 74 at 15 para 81
11  *Id.* at 15 para 84-85
12  Shawnee County Sheriff, *150th Anniversary*, (Accessed September 7, 2022), available at: http://www.shawneesheriff.org/sh/document/150th_Anniversary_Part_3.pdf
13  D.E. 74 at 31
14  Exhibit B
15  Exhibit C
16  Exhibit D-1 at 4
17  Exhibit D-2; D.E. 74 at 32 para 189

Mr. Parcells original prescription for Oxycodone continued from February 2016 through at least January 2018.[18] After being prescribed pain killers, and getting to the point where he was taking 6-8 pills a day, Mr. Parcells sought treatment in 2017 at Awakening KC.[19] During that treatment effort, Mr. Parcells suffered from a seizure.[20] He entered a treatment program again in 2018 but suffered from withdrawal symptoms and the pain in his foot returned when he stopped taking the pills.[21] He admitted during that effort at treatment that he had taken more medication than was prescribed to him, but was doing better.[22] He was diagnosed with Opioid Disorder.[23] Mr. Parcells later sought treatment in 2018 and was prescribed Suboxone.[24] He later tested positive for Oxycodone at that program.[25]

The prescription drugs that Mr. Parcells was addicted to are considered in the class of drugs called opioids.[26] Mr. Parcells is far from alone in becoming addicted to these drugs. It is estimated that in 2015, 20.5 million Americans had a substance abuse disorder and two million had a substance abuse disorder involving prescription pain killers.[27] Addiction "is a condition in which something that

---

18 Exhibit C at 2
19 D.E. 74 at 32 para 190
20 *Id.*
21 *Id.* at para 191
22 *Id.*
23 *Id.*
24 *Id.* at 33 para 193
25 *Id.*
26 American Society Of Addiction Medicine, *Opioid Addiction 2016 Facts and Figures*, accessed September 7, 2022, available at: https://www.asam.org/docs/default-source/advocacy/opioid-addiction-disease-facts-figures.pdf
27 *Id.*

started as pleasurable now feels like something you can't live without."[28]  The Mayo

Clinic Staff explains Opioid addiction as follows:

> Doctors define drug addiction as an irresistible craving for a drug, out-of-
> control and compulsive use of the drug, and continued use of the drug
> despite repeated, harmful consequences. Opioids are highly addictive, in
> large part because they activate powerful reward centers in your brain.
> Opioids trigger the release of endorphins, your brain's feel-good
> neurotransmitters. Endorphins muffle your perception of pain and boost
> feelings of pleasure, creating a temporary but powerful sense of well-being.
> When an opioid dose wears off, you may find yourself wanting those good
> feelings back, as soon as possible. This is the first milestone on the path
> toward potential addiction.[29]

After his arrest on this case, Mr. Parcells was released with conditions,

including an employment condition on December 16, 2020.[30]  Over the next several

months, Mr. Parcells struggled in keeping up with routine paperwork (job search

forms), and had trouble maintaining employment at a number of employers.[31]  Mr.

Parcells was remanded to custody based on a number of relatively minor violations

including being late from curfew, failing to complete paperwork, and an inability to

maintain employment. This performance is indicative of what Mr. Parcells has been

like over the last six-years—an addict. For example, the probation office noted that

on one occasion, a home contact was conducted, and Mr. Parcells was asleep at

11:03 a.m.[32]  Even efforts to contact Mr. Parcells' attorney, a previous near-

---

28 Mayo Clinic, *How Opioid Addiction Occurs*, April 12, 2012, available at:
https://www.mayoclinic.org/diseases-conditions/prescription-drug-abuse/in-depth/how-opioid-
addiction-occurs/art-20360372
29 *Id.*
30 D.E. 74 at 9
31 *Id.* at 4-6
32 *Id.* at 4 para 16

revocation from Magistrate Judge Mitchell, and the addition of electronic monitoring and a curfew[33] did not correct these relatively minor violations. The reason is simple—Mr. Parcells was still addicted to prescription pain killers.

Despite his addiction and problems on release, Mr. Parcells never missed a court date and consistently kept in contact with his probation officer. His detainer from Wabaunsee County District Court only exists because he was placed in federal custody the Friday before the Monday when he had a scheduled court date in Wabaunsee County.

Mr. Parcells was remanded to custody on February 28, 2022.[34] Since being incarcerated, Mr. Parcells engaged in treatment with Dr. Wiseman, who is one of the Psychologists that runs USP-Leavenworth's RDAP program.[35] Mr. Parcells is taking once a month injections of Naltrexone, which helps prevent relapse.[36] He has now been sober for over six-months and has found a treatment program and medication that has him feeling the best he has felt in several years.[37]

**B. The need for the sentence to reflect the seriousness of the offense, deter criminal conduct, and protect the public.**

**1. The seriousness of the offense**

Mr. Parcells offense relates to wire fraud surrounding his business, National Autopsy Services. On a number of occasions, Mr. Parcells falsely misrepresented his

---

33 *See* D.E. 33, 38
34 D.E. 56
35 D.E. 74 at 34 para 199
36 *Id*.
37 *Id*. at 34

credentials, completed autopsy reports in his own name despite lacking the qualifications to opine on cause of death, signed autopsy reports in the names of pathologists who did not complete the report, misrepresented the extent of NAS' office locations, and never provided a final autopsy report to a number of victims.

Mr. Parcells argues that the guideline itself properly accounts for the seriousness of the offense. It already includes a two-level enhancement because the offense involved ten or more victims. The loss amount will add another 12 or 14 levels depending on the Court's resolution of objection 11. Those two increases take into account the financial loss associated with the offense and the number of victims of the offense. He may receive other enhancements depending on the Court's resolution of pending objections. Because Mr. Parcells is requesting a guideline sentence in this case, he argues that any aggravating circumstances present in the offense are properly taken into consideration by the guidelines.

### 2. The need to deter criminal behavior and protect the public

Mr. Parcells' only prior criminal history is a DUI from 2019.[38] The facts of that DUI also support that Mr. Parcells was addicted to painkillers, as he was slurring his words and collided with a barrier wall. He was given a preliminary breath test which did not indicate the presence of alcohol and admitted to being on several prescribed medications.[39] His only other prior conviction is relevant conduct to this offense.

---

[38] D.E. 74 at 29 para 171
[39] *Id.*

Mr. Parcells also entered in a consent judgement related to conduct in this case with the Kansas Attorney General's Office. That judgement includes a permanent injunction that prohibits Mr. Parcells from engaging in any of the conduct related to this offense.[40]  Mr. Parcells also agreed to pay restitution to victims in the amount of $254,762.98.[41]

Mr. Parcells has also been involved in a treatment program while serving his sentence at USP-Leavenworth. He has found a medication and treatment program that he is hopeful will allow him to end his six-year long addiction. The Court is likely to impose conditions that should assist him in those efforts. Sobriety for Mr. Parcells will reduce his risk of recidivism and protect the public.

### 3. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

A guideline sentence would avoid unwarranted sentence disparities among those, like Mr. Parcells, who are sentenced under USSG § 2B1.1 with a criminal history category I. The average sentence imposed for theft, property destruction, and fraud offenses generally in 2021 was 21 months.[42]  For those convicted under USSG §2B1.1 who were also scored as criminal history category I (like Mr. Parcells) during the last five-years (2017-2021), over 76% of people received a sentence of less than 24-months. Only 16.3% received a sentence of 24 to 59 months and only 5.6%

---

40  Exhibit E at 6-9
41  *Id.* at 10
42  United States Sentencing Commission, *Quick Facts: Theft, Property Destruction, and Fraud Offenses* (2021), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY21.pdf

of people received a sentence from 60 to 119 months. Less than 2% of people were sentenced to a sentence of 120-months or more.[43]





**Distribution of Sentence Length**
Fiscal Year 2017,2018,2019,2020,2021

120 Months or More 1.9%
60 to 119 Months 5.6%
24 to 59 Months 16.3%
Up to 24 Months 76.2%

The figure includes the 18,644 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.
**FILTER:**
Fiscal Year: 2017,2018,2019,2020,2021; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

Narrowing the focus to those sentenced in the Tenth Circuit only, shows that over 85% of those sentenced who were sentenced under the same guideline and criminal history as Mr. Parcells received a sentence of less than 24-months with 10.9% receiving a sentence between 24 and 59 months and only 4% receiving a sentence of 60 to 119 months.[44]  Notably, zero people (out of 782) sentenced in the Tenth Circuit over the last five-years under the same guideline and criminal history as Mr. Parcells received a sentence of over 120-months.[45]

---

43  United States Sentencing Commission, *Interactive Data Analyzer*, (accessed August 31, 2022), available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard
44  *Id.*
45  *Id.*



**Distribution of Sentence Length**
Fiscal Year 2017,2018,2019,2020,2021

60 to 119 Months 4.0%
24 to 59 Months 10.9%
Up to 24 Months 85.1%

The figure includes the 782 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.
**FILTER:**
Fiscal Year: 2017,2018,2019,2020,2021; Circuit: 10th Circuit; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

Further narrowing the data to the District of Kansas shows that nearly 90% of those sentenced under the same guideline and criminal history as Mr. Parcells received a sentence of less than 24-months while only 5.3% received a sentence of 24 to 59 months and 5.3% received a sentence of 60 to 119 months' imprisonment.[46]



**Distribution of Sentence Length**
Fiscal Year 2017,2018,2019,2020,2021

60 to 119 Months 5.3%
24 to 59 Months 5.3%
Up to 24 Months 89.5%

The figure includes the 143 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.
**FILTER:**
Fiscal Year: 2017,2018,2019,2020,2021; Circuit: 10th Circuit; State: Kansas; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

---

46 *Id.*

A guideline sentence in this case would reflect the seriousness of Mr. Parcells'
offense but would also take into consideration his characteristics including his lack
of criminal history and his addiction to controlled substances that contributed to the
offense conduct.

## II.    The unresolved guideline objections

### A.  Loss Amount

The guideline at issue, USSG §2B1.1 is largely driven by the "loss" amount
involved.[47]  Although not stated, it appears the PSR has used the actual loss
amount in the case, which "means the reasonably foreseeable pecuniary harm that
resulted from the offense."[48]  The government concurs with this method. Mr.
Parcells understands that the commentary permits the loss amount to be based on
"a reasonable estimate of the loss."[49]  However, use of an unreasonable method to
calculate the loss is improper and constitutes error.[50]

The government misrepresents Mr. Parcells' objection by claiming that he has
argued that the loss amount should be offset by 'legitimate business expenses' or
'operating expenses.'[51]  This is not Mr. Parcells' argument. Instead, he contends that
some of the government's claimed loss is not loss under the guidelines in the first
place. The commentary to USSG § 2B1.1 defines actual loss as "the reasonably

---

47 USSG § 2B1.1(b)(1).
48 *Id*. at cmt note 3(A)(i)
49 *Id*. at cmt note 3(C)
50 *United States v. James*, 592 F.3d 1109, 1115 (10th Cir. 2010).
51 D.E. 74 at 48

foreseeable **pecuniary harm** that resulted from the offense."[52]  Pecuniary harm is defined as "harm that is monetary or that otherwise is readily measurable in money."[53]  If a person paid for a service and properly received the thing they paid for, they have not suffered any pecuniary harm. The government has the burden to establish that a claimed loss is "pecuniary harm."[54]

The *Marvin* case cited by the government is based on claimed legitimate operating expenses such as advertising, telemarketing, and legal fees.[55]  As the government explains, these expenses are related to "the cost of running a business."[56]  This is not the claim being made by Mr. Parcells. None of the categories of non-pecuniary harm outlined below are related to or similar to (the government example) sending "another technician to collect samples."[57]

The government's proposed method to estimate loss is simply to add up deposits made into Mr. Parcells' bank accounts without any determination of the source of those deposits. This method could be reasonable if Mr. Parcells were unable to establish that any of the deposits into those accounts were non-pecuniary harm. Then, the Court could assume that, because the government has shown that a number of deposits were properly loss, that therefore all deposits were properly loss.

Mr. Parcells instead maintains that his business involved a number of

---

52 USSG § 2B1.1 cmt note 3(A)(i) (emphasis added)
53 USSG § 2B1.1 cmt note 3(A) (iii)
54 *United States v. Griffith*, 584 F.3d 1004, 1017 (10th Cir. 2009).
55 *United States v. Marvin*, 28 F.3d 663, 665 (7th Cir. 1994).
56 D.E. 74 at 49; *citing United States v. Cusaumano*, 2015 WL 10324107 at *8 (N.D. Fla. Dec. 31, 2015).
57 D.E. 74 at 49

consumers who were not victims and did not suffer any pecuniary harm through his conduct. That is because some of Mr. Parcells' business was legitimate and so the money he earned (and was deposited in his account) from that legitimate, non-fraudulent business did not result in any 'pecuniary harm' and thus cannot be considered loss under the guidelines. We explain each category of non-pecuniary harm here.

### 1. Work performed by a pathologist

A number of cases were worked on by a pathologist. Because those cases were performed as requested, no pecuniary harm was suffered and therefore they should not be considered loss. For example, in line 127 of the government's spreadsheet[58], a victim is listed as Leslie Haines. Ms. Haines requested an autopsy for Lynda Joy Haines. The autopsy was performed by Dr. Andrew Sibley, a board-certified pathologist and a copy of that report is attached.[59] The same is true of line 64 in the government's spreadsheet which alleges Sandra Battles as a victim related to an autopsy for Frederick Douglas France. Again, Dr. Andrew Sibley prepared an autopsy report for that case.[60] The same is also true of line 23 in the government's spreadsheet related to Sandra and Samuel Bachelor. Dr. Andrew Sibley prepared an autopsy report for Samuel Bachelor, Sr.[61] Dr. Sibley also completed a report for line 21 on the government's spreadsheet related to Andrew Kline. A report was

---

58 These lines are from the spreadsheet the government provided in PSR objections and intends to present to the Court at the sentencing hearing. It is referenced in the PSR at p. 42 in footnote 5.
59 Exhibit F
60 Exhibit G
61 Exhibit H

prepared for Michael E. Kline by Dr. Sibley.[62]

## 2. Work requested for and completed by a neuropathologist

In some cases, people who contacted NAS requested a more limited service such as neuropathology or brain-only work. Mr. Parcells used Dr. Murat Gokden, a Neuropathologist at the University of Arkansas for Medical Sciences for this type of work.[63] One such case was for Rex Christian, listed as a victim on the government's spreadsheet at line 70 (listed as Rex & Margaret Christian). But the family of Mr. Christian requested "brain-only"[64] and Dr. Gokden provided a report as requested.[65] The same is true of Lenora Snapp, listed as a victim on the government's spreadsheet on line 94. The family of Mrs. Snapp requested a "cranial-only"[66] autopsy and Dr. Gokden prepared such a report.[67]

Although not on the government spreadsheet (perhaps because they are buried somewhere in one of the other payments systems such as Square), we also know that the family of Marilynne Hollis[68] and Janet Mills[69] also requested similar limited work and that Dr. Gokden completed reports for both as requested.[70]

## 3. Consulting related work

Mr. Parcells was retained on a number of cases to consult related to various

---

62  Exhibit I
63  D.E. 74 at 16 para 89
64  Exhibit J
65  Exhibit K
66  Exhibit L
67  Exhibit M
68  Exhibit N
69  Exhibit P
70  Exhibits O and Q

medical topics. There is no allegation that anyone who hired Mr. Parcells to consult was a victim of Mr. Parcells' fraud. As long as Mr. Parcells properly identified his qualifications to these individuals (and there is no evidence he did otherwise), any work he did consulting could not have caused any pecuniary harm.

Examples of cases the government claims are loss, which are not because they related to consulting work Mr. Parcells did include line 30 on the government spreadsheet related to Stephanie Ross. The note to that entry says it is related to the "Nyla Lauck Case/Expert Services/Breath Test." That case involved a DUI in Topeka Municipal Court which was appealed to Shawnee County District Court and ultimately to the Kansas Court of Appeals.[71]  Entry number 115 is related to the same case as the note lists the payment for "Nyla Lauck/File Testimony."

The same is true for line 31 which is listed as "Eric Jorlie" which is a misspelling of Mr. Parcells' former attorney on this case, whom Mr. Parcells did some consulting work for. Line 51 lists Lindner & Marquez/Attorneys and the note mentions Heberlee Trial. Rick Heberlee was charged with criminal offenses in Scott County and was represented by J. Scott Koksal of Lindner and Marquez.[72]  The government lists Matthew Williams/Attorney as a victim in line 107 even though the note stated "2016-CR-2666/J. Montgomery expert fee."

---

[71] *See City of Topeka v. Nyla Lauck,* 401 P.3d 1064, (Kan. App. 2017) (unpublished, Case No. 116,316)
[72] The Scott County Record, *Heberlee Waives 5th; testifies in his own defense*, September 22, 2016, available at: https://issuu.com/scottcountyrecord/docs/screcord_09222016;
https://www.linkedin.com/in/scott-koksal-869b03113/

### 4.  Tissue donation related work

Mr. Parcells' business also did tissue donation work for medical research. Such work does not require a pathologist and can be performed by a Pathologist Assistant.[73]  An example of this type of work that the government currently claims as loss is line 102 on the government's spreadsheet which is related to Washington University in St. Louis. A number of pathologist assistants also confirmed that they did tissue recovery related work for Mr. Parcells.[74]  Finally, Mr. Parcells' bank account included deposits from University of Miami, National Disease Research Interchange, and Boston University.[75]  It appears the government has removed those from its final list, but we are left to guess how many deposits through Square/Stripe, etc., may have also been related to tissue donation.

### 5.  The government's proposal is unreasonable

The government proposes that the loss amount should be determined by simply adding up the money that was deposited into Mr. Parcells' bank accounts. The government's position appears to be that because it has shown that Mr. Parcells engaged in fraudulent transactions, that therefore **all transactions** must also be fraudulent. And that presumption might be reasonable unless Mr. Parcells were able to prove that some of the money that came into those accounts was related to non-fraudulent business that caused no pecuniary harm.[76]

---

73  D.E. 74 at 18
74  *Id*. at 18 (Petsch); at 19 (Beckett)
75  Exhibit R
76  *See United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (clearly erroneous finding because the court adopted a flawed statistical analysis proposed by the government);

But as explained above, a number of the alleged victims from the government's spreadsheet are not proper victims because they suffered no pecuniary harm. Those include the following: **Line 21**: autopsy report provided by Dr. Sibley; **Line 23**: autopsy report provided by Dr. Sibley; **Line 30**: consultation work; **Line 31**: consultation work; **Line 51**: consultation work; **Line 64**: autopsy report provided by Dr. Sibley; **Line 70**: neuropathology only report by Dr. Gokden; **Line 102**: tissue donation work related to Washington University; **Line 107**: consultation work; **Line 115**: consultation work; **Line 127**: autopsy report provided by Dr. Sibley.

The government's method has another problem—the Court has no idea where the money from a number of sources came from. Those lines include: **Line 3**: Square, Inc; **Line 4**: WePay; **Line 5**: Cash Deposits; **Line 6**: Stripe; **Line 12**: Paypal Transfers; **Line 25**: Venmo; **Line 120**: Stripe Transfers; **Line 121**: Paypal Transfers; **Line 160**: Cash Deposits.

## 6.  Mr. Parcells proposed loss amount

The government "bears the burden of proving loss by a preponderance of the evidence."[77]  However, in this case Mr. Parcells proposes his own method of establishing the loss amount in his case. The investigation in this case was started by the Kansas Attorney General's Office ("Kansas AG"). To this day, the Kansas AG has continued to dedicate a portion of its website to its work regarding Mr. Parcells.[78]  As part of that work, the Kansas AG has accepted complaints from

---

77 *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009).
78 The page is located at: https://ag.ks.gov/in-your-corner-kansas/resources/state-v-parcells

victims of Mr. Parcells and compiled a list of victims it has been able to document in this case. That list includes 100 victims and is attached as Document 74-2 to the PSR. The total amount of loss listed on that document is $280,027.98.[79] As candor to the Court, that list does also not include the following victims Mr. Parcells admits are also proper victims:

| Antoinette Grewel - $3200 | Shaneen Hedgeman - $3200 | Sherry Jones - $5275 |
|---|---|---|
| John Metrose - $4000 | Ryan Palmer - $4100 | Viola Teasley - $2000 |
| James Welch - $5000 | Lois Zeuch - $4300 | |

Mr. Parcells therefore proposes that the Court should calculate the total loss in the case to be $311,102.98. This amount accounts for all of the victims identified by the Kansas AG (and adds some admitted to by Mr. Parcells). This method avoids the flaws in the government approach explained above.

### B. Sophisticated Means

Mr. Parcells objected to the two-level increase applied in the PSR that alleges the offense involved sophisticated means under USSG § 2B1.1(b)(10)(C).[80] The commentary to the guideline defines sophisticated means as "**especially** complex or **especially** intricate offense conduct pertaining to the execution or concealment of an offense."[81] The commentary provides an example of such conduct that ordinarily would be sophisticated means as "the use of fictitious entities, corporate shells, or

---

79  D.E. 74-2 at 4
80  D.E. 74 at 49 para 293
81  USSG § 2B1.1 cmt note 9(B) (emphasis added)

offshore financial accounts."[82]

The government argues that Mr. Parcells' offense was especially complex or intricate because he "created a website" (which he did not create but hired a firm to make) that had a number of false statements. That firm (Axsen) created, edited, and controlled Mr. Parcells' website, and even shut it down in March 2019 after the temporary restraining order was entered in the civil case.

On Mar 30, 2019, at 12:44 PM, Mike Vincent (mike.vincent@axsen.com) <mike.vincent@axsen.com> wrote:

Dear Shawn Parcells,

This morning we were made aware of a temporary restraining order placed on your website. We reviewed the following civil petition (http://bit.ly/2JFhim5), temporary restraining order (http://bit.ly/2HVIlrR) and criminal complaint (http://bit.ly/2FApFv5) against you and have removed your website accordingly.

As your host provider you have the obligation to inform us of the above requirement to remove your website and you did not. Considering your past payment history and your failure to inform us of the suspension requirement in the temporary restraining order, we have terminated your account effective immediately.

Your email account will remain active through April 30, 2019. On May 1, 2019 it will also be terminated.

Your domains are reserved in your name at eNom. The web content is your intellectual property, as such we will release a copy to you at no charge at your request.

Sincerely,

**Mike Vincent**

Director of Operations

Axsen LLC

5472 Black Avenue, Suite 1000

Pleasanton, CA 94566

925-398-0112 x503 Phone

wwwaxsen.com

mike.vincent@axsen.com

Simply hiring a company to create a website cannot be especially complex or intricate.[83]  The World Wide Web (WWW) was invented in 1989 by British scientist

---

82 *Id.*

83 *See United States v. Executive Recycling, Inc.*, 953 F.Supp.2d 1138, 1167 (D. Co. 2013) ("However, the Court finds that the use of mass mailings hardly makes the fraudulent conduct sophisticated. If anything, mass mailings are inherently unsophisticated in the digital age. Along the same lines, if the Court were to find that the use of a website—particularly one as rudimentary as Executive Recycling's website—constituted 'sophisticated means', then the enhancement would apply in nearly every fraud case, which surely could not have been the Sentencing Commission's intent when it adopted this enhancement guideline."

Tim Berners-Lee.[84]  The first web page went live on August 6, 1991[85] and the

software behind the WWW was put in the public domain in 1993.[86]  Nearly thirty

years later there are over 1.1 billion total websites in the world, with nearly 200

million active websites. It is estimated that 252,000 new websites are created every

day, over 10,000 created every hour, and 175 created every minute. Mr. Berners-Lee

announced that the one billion total website number was passed in 2014.[87]  In 2016,

the number of websites grew significantly, almost doubling during the course of the

year.[88]

The rest of the government's argument amounts to the fact that Mr. Parcells

made fraudulent representations. Simply making fraudulent representations is not

akin to "**especially** complex or **especially** intricate" conduct (emphasis added).[89]

Further, this conduct is far from the examples provided in the commentary of

created fictitious entities, corporate shells, or using offshore accounts to hide

funds.[90]  Mr. Parcells did list various locations across the country which were

---

84  CERN, *The Birth of the Web*, (accessed September 2, 2022), available at:
https://home.cern/science/computing/birth-web
85  Business Insider, *FLASHBACK: This is What the First-Ever Website Looked Like*, June 29, 2011,
available at: https://www.businessinsider.com/flashback-this-is-what-the-first-website-ever-looked-like-2011-6
86  CERN, *The Birth of the Web*, (accessed September 2, 2022), available at:
https://home.cern/science/computing/birth-web
87  Berners-Lee, Tim, *Twitter*, September 16, 2014, available at:
https://twitter.com/timberners_lee/status/511988109211627520
88  Internet Live Stats, *Total Number of Websites*, (accessed September 2, 2022), available at:
https://www.internetlivestats.com/total-number-of-websites/
89  *See United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011) ("Application of the adjustment is
proper when the conduct shows a greater level of planning or concealment than a typical fraud of its
kind.").
90  *Cf. United States v. Igboba*, 964 F.3d 501, 511 (6th Cir. 2020) (Applying the enhancement where
the defendant used "an anonymous electronic black market financial network and concealed his
actions through complex methods such as VPN software." The defendant there specifically purchased

mortuaries or other similar facilities not directly affiliated with NAS (but where NAS had either obtained tissue samples or had done similar work). Listing existing mortuaries is far from creating fictitious entities or corporate shells or hiding funds in offshore accounts. On the contrary, Mr. Parcells' funds were all deposited into Bank of America accounts listed in his name.

The probation office responds that Mr. Parcells' email signature showed sophisticated means. Creating an email signature is not especially complex or especially intricate. The probation office also argues that the use of certain abbreviations in the signature establishes Mr. Parcells' fraud was especially complex or especially intricate. In the example provided, BS is a common abbreviation for Bachelor of Science which is a college degree in a number of areas including the natural sciences.[91] Mr. Parcells properly has a Bachelor of Science degree from Kansas State University.[92] The abbreviation MSHAPI is the abbreviation for Masters of Science in Human Anatomy and Physiology Instruction used by Northeast College of Health Sciences,[93] where Mr. Parcells obtained that degree.[94] The abbreviation PA related to a Pathology Assistant. The abbreviation DrPH is related to a Doctor of Public Health.[95] As Mr. Parcells admitted when he

---

PII from a Somalian website. The defendant also used corporate shell companies).

91  Lehigh University College of Arts and Sciences, *BA Versus BS*, website available at: https://cas.lehigh.edu/content/ba-vs-bs-degrees

92  D.E. 74 at 34

93  Northeast College of Health Sciences, *Master of Science in Human Anatomy and Physiology Instruction*, Tear Sheet available at: https://www.northeastcollege.edu/webdocs/registrar/HAPI-Tear_Sheet_102021.pdf?

94  D.E. 74 at 34

95  Johns Hopkins University, Bloomberg School of Public Health, *Doctor of Public Health (DrPH)*, available at: https://publichealth.jhu.edu/academics/drph

was interviewed, the abbreviation of DrPH-S (as he explained) meant (to him) that he was a student working towards that degree. There is no such designation, and that abbreviation is not commonly used. But because that representation was misleading, does not also make it especially complex or especially intricate. The probation office notes that Mr. Parcells also put in claimed titles such as "Forensic Epidemiology Fellow." Again, those claimed titles are misleading but are not especially complex or intricate.

The probation office also cites to *Redman*, a Seventh Circuit case.[96] That case is not binding on this Court and is distinguishable. There, Mr. Redman committed identify theft to represent himself as Dr. Julian Lopez Garcia, including falsifying "an Indiana driver's license with Redman's picture, photocopy of an Illinois medical license, photocopy of a medical school diploma, a residency certificate for training in psychiatry, and a photocopy of a social security card."[97] He also submitted a falsified DEA form 224 "using false information to obtain a DEA registration number, thereby enabling him to prescribe controlled substances."[98] The *Redman* court relied on the sophistication of the scheme fooling other doctors.[99] Mr. Parcells certainly listed his qualification on his signature in a misleading way. Nothing about that is intricate in the way that creating fake documents to a level to pass DEA approval is.

---

96 D.E. 74 at 52
97 *United States v. Redman*, 887 F.3d 789, 791 (7th Cir. 2018).
98 *Id.*
99 *Id.* at 793

### C. Vulnerable Victim enhancements

### 1. USSG § 3A1.1(b)(1)

Mr. Parcells objected to his offense level being increased because he "knew or should have known that a victim of the offense was a vulnerable victim."[100]  The commentary to the guideline defines a vulnerable victim as "a person who is a victim of the offense . . . and who is **unusually vulnerable** due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."[101]  The enhancement is intended to apply to "those who are in need of greater societal protection."[102]  "In order to classify a victim as vulnerable, the sentencing court must make particularized findings of vulnerability. The focus of the inquiry must be on the victim's personal or individual vulnerability."[103]

The enhancement does not apply here. The government relies on largely unpublished and of out of circuit cases to analogize those facts to Mr. Parcells' facts. In the Tenth Circuit, solely that a victim's vulnerability made the crime possible does not necessarily "make the victim an unusually vulnerable victim."[104]  The enhancement cannot be based on the vulnerability created by the close connection between family members, as the Tenth Circuit has rejected that view.[105]  In *Creech*, the Court held that:

---

100 USSG § 3A1.1(b)(1).
101 USSG § 3A1.1 cmt note 2 (emphasis added)
102 *United States v. Brunson*, 54 F.3d 673, 676 (10th Cir. 1995).
103 *Id*.
104 *United States v. Brunson*, 54 F.3d 673, 677 (10th Cir. 1995).
105 *United States v. Creech*, 913 F.2d 780, 782 (10th Cir. 1993).

We believe the court's finding was clearly erroneous because it did not focus on the victim, but rather upon a class of persons to which the victim belonged. Assuming newlywed persons as a class are more prone to comply with extortionate demands than those whose wedded bliss has endured the test of longevity, we do not believe their vulnerability is that which was foreseen or intended by the Commission.

To the contrary, the commentary appended to § 3A1.1 indicates the vulnerability must be "unusual." There is nothing in the record to suggest the concern a bridegroom has for his bride is more than that a husband longer in the tooth has for the light of his life. We may freely presume, at least as a generality, that most married persons would become agitated over a threat of harm directed to their spouses. Thus, in the absence of specific evidence to the contrary, such concern would not be "unusual" within the context of the guideline.[106]

The government appears to argue that because all of the victims in this case lost someone close to them, that they therefore are vulnerable as a class.[107] The Tenth Circuit rejected application of the vulnerable victim enhancement in a case where a victim was himself concerned with possible premature death and engaged in the transaction "to put his financial affairs in order and limit any potential negative consequences to his family should he pass away."[108] Even with noting that the defendant feigned "empathy and offer[ed] to help him by recommending a medical specialist."[109] The Tenth Circuit found the vulnerable victim enhancement under those facts was "clearly erroneous" and concluded that "allowing a vulnerable victim enhancement based on illness alone would suggest that sick individuals as a group

---

[106] *Id.*
[107] D.E. 74 at 55 para 313
[108] *United States v. Proffit*, 304 F.3d 1001, 1007-1008 (10th Cir. 2002).
[109] *Id.* at 1008

qualify as vulnerable victims. Our prior cases reject the granting of vulnerable victim status to members of a group."[110]

The enhancement also cannot be supported because the victims were likely to "fall for it."[111]  In *Brunson*, the Tenth Circuit rejected applying the enhancement where the victim was a foreign company that was unfamiliar with the United States free market economy and because of a language barrier. The Court found those factors "insufficient to support a finding of special vulnerability."[112]  The Court noted that, "The district court also placed great weight on the fact that Mr. Brunson apparently singled out foreign companies because they could be more easily duped. While it is true that the defendant targeted the Russian Coal Company for his fraudulent scheme because he thought that they might fall for it, the same could be said of virtually all schemes to defraud."[113]

Finally, the probation office argues that the enhancement can apply to "a class of people due to the commonality of a loss of a loved one."[114]  This analysis is inconsistent with Tenth Circuit authority previously cited.

## 2.  USSG § 3A1.1(b)(2)

Mr. Parcells is aware of *United States v. Kaufman*, 546 F.3d 1242 (10th Cir. 2008) which stated in "these circumstances, more than ten vulnerable victims is a

---

110  *Id*.
111  *Brunson*, 54 F.3d at 677; *also see United States v. Proffit*, 304 F.3d 1001, 1008 (10th Cir. 2002).
112  *Id*.
113  *Id*.
114  D.E. 74 at 56 para 323.

large number under USSG § 3A1.1(b)(2)."[115]  In *Kaufman*, the Tenth Circuit also required individual assessments of "which of the Kaufman House residents were vulnerable victims."[116]  The Court should do the same here.

### D. Abuse of a Position of Trust

Mr. Parcells objected to the two-level enhancement for abuse of a position of public trust.[117]  He explained the objection was because the commentary to this enhancement expands the definition of USSG § 3B1.3 in that it expands position of trust to include those who falsely represent they hold such a position. Under a strict reading of the guideline itself, the enhancement would not apply to Mr. Parcells because he did not hold any position of "public or private trust."[118]  The commentary to the guideline provides examples of the types of positions of trust that would apply including "an attorney serving as a guardian" a bank executive or a physician.[119]  Because Mr. Parcells did not actually hold a position of trust as a doctor or pathologist, the guideline can only apply if the commentary expands the definition to include cases where "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not."[120]

---

115  *Cf United States v. Mooty*, 25 Fed. Appx. 501 (8th Cir. 2002) (unpublished) ("we hold that seven is not, as a matter of law, a large number within the meaning of section 3A1.1(b)(2)") (fraud convictions).
116  *United States v. Kaufman*, 546 F.3d 1242, 1269 (10th Cir. 2008).
117  D.E. 74 at 56 para 320
118  USSG § 3B1.3
119  *Id*. at cmt note 1
120  *Id*. at cmt note 3

The commentary note therefore broadens the definition of "public or private trust" in a way that covers the facts of this case. The Supreme Court's decision in *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), disallows deference to the broader application note where, as here, the text is unambiguous. *Kisor* sharply curtailed deference to the interpretations of administrative bodies when the text actually enacted by Congress is clear. As the *Kisor* court explained, the unambiguous text controls, so the application note has no role to play. The Court should refuse to apply this enhancement.

1. ***Seminole Rock* deference**

Though in principle it "is emphatically the province and duty of the judicial department to say what the law is"[121], a line of Supreme Court decisions ending in *Kisor* inappropriately undermined judicial independence by requiring deference to the interpretations of unelected administrative agencies. That line of decisions began with *Bowles v. Seminole Rock and Sand*, 325 U.S. 410, 413-4 (1945).

*Seminole Rock* held that, when a Court seeks to interpret a federal regulation, the "ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."[122] The Court reaffirmed that "deferential standard" in *Auer v. Robbins*, 519 U.S. 452, 461 (1997).[123] *Seminole Rock* and *Auer* enfeebled judicial review, "effectively turn[ing]

---

121 *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).
122 *Seminole Rock*, 325 U.S. at 414.
123 519 U.S. at 461 (because "the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation.")

the law-interpreting process over to an agency in any case where a government lawyer could keep a straight face while arguing that the agency had reasonably read an arguably ambiguous rule."[124]

## 2. *Seminole Rock* and the Sentencing Guidelines

The United States Sentencing Commission was among the many federal agencies empowered by *Seminole Rock*. In *Stinson v. United States*, 508 U.S. 36 (1993), the Court considered the binding effect of guideline commentary. *Stinson* concluded, explicitly citing *Seminole Rock*, that the Commission's commentary "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation it interprets."[125] This was so, said *Stinson*, even though commentary "is not reviewed by Congress, and prior judicial constructions of a particular guideline cannot prevent the Sentencing Commission from adopting a conflicting interpretation that satisfies the standard adopted herein."[126]

After *Stinson*, guideline commentary promulgated by unelected officials conclusively resolved interpretive questions in our circuit. As then Judge Gorsuch wrote, the "Commission writes the Guidelines' equations, and its commentaries on how to perform them are due deference from us much like the math teacher's directions to his pupil."[127] There was no room left for judicial review; even when the

---

124 Larkin, *Baseball, Legal Doctrines, and Judicial Deference to an Agency's Interpretation of the Law: Kisor v. Wilkie*, 2019 Cato Sup. Ct. Rev. 69, 77 (2019)
125 *Stinson*, 508 U.S. at 37.
126 *Id.*
127 *United States v. Rendon-Alamo*, 621 F.3d 1307, 1309 (10th Cir. 2010); *United States v. Figueroa-Labrada*, 720 F.3d 1258, 1265 (10th Cir. 2013) (Citing *Stinson* and applying commentary to define USSG § 1B1.3); *United States v. Robertson*, 350 F.3d 1109, 1117 (10th Cir. 2003) (Citing *Stinson* and applying commentary to support USSG § 2A3.2(b)(3) enhancement); *United States v. Murphy*, 901

Circuit found the Commission's interpretation plainly incorrect, it would still defer.[128]

### 3. *Kisor* restores judicial power

*Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), dramatically restricted *Seminole Rock/Auer* deference. Justice Kagan's majority opinion limited deference in three significant ways.

First "and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." And "before concluding that a rule is genuinely

---

F.3d 1185, 1190-1 (10th Cir. 2018) (Citing *Stinson* and using commentary to interpret USSG § 2D1.1(b)(12)); *United States v. Morris*, 562 F.3d 1131, 1136 (10th Cir. 2009) (Relying on *Stinson* for the proposition that "the Sentencing Commission's commentary represents the most authoritative statement of how the guidelines should be applied" and concluding that "we cannot say that Application Note 14(B)(i) is inconsistent with § 2K2.1(b)(6)."); *United States v. Farnsworth*, 92 F.3d 1001, 1007 (10th Cir. 1996) (Finding the commentary to USSG § 2K2.1(a)(2) dispositive under *Stinson*); *United States v. Ortiz*, 427 F.3d 1278 (10th Cir. 2005) (Using *Stinson* to apply the commentary to USSG § 2Q1.3); *United States v. Butler*, 694 F.3d 1177 (10th Cir. 2012) (Finding commentary "authoritative" under *Stinson* and interpreting USSG § 2Q2.1 by reference to application notes); *United States v. Silva*, 981 F.3d 794, 798-9 (10th Cir. 2020) (Citing *Stinson* and relying on guideline commentary to interpret USSG § 4A1.1); *United States v. Chavez*, 660 F.3d 1215, 1228 (10th Cir. 2011) (Under *Stinson*, holding that USSG § 4B1.2 includes attempt offenses; "the commentary interprets controlled substance offenses as including convictions for attempted drug trafficking, and because the commentary is authoritative, the district court properly determined that Mr. Chavez should be classified as a career offender."); *United States v. Small*, 423 F.3d 1164, n. 13 (10th Cir. 2005) ("Application Note 1 of § 4B1.2(a) states that a 'crime of violence' includes "the offenses of aiding and abetting, conspiring, and attempting to commit such offenses.' U.S.S.G. § 4B1.2(a) cmt. n. 1 (2002). Such commentary is 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of,' the guideline it interprets. *Stinson v. United States*, 508 U.S. 36, 38 (1993). The district court therefore did not err in classifying attempted escape as a crime of violence under the Guidelines."); *United States v. Gieswein*, 887 F.3d 1054, 1060 (10th Cir. 2018) (Applying commentary to define "forcible sex offense" under USSG § 4B1.2; *United States v. Evans*, 782 F.3d 1115, 1117 (10th Cir. 2015) (Under *Stinson*, using application notes to define USSG § 4B1.5(b)); *United States v. Hargrove*, 911 F.3d 1306, 1328 (10th Cir. 2019) (Citing *Stinson* and applying guideline to interpret USSG § 5C1.2).

128 *United States v. Smith*, 433 F.3d 714, 716-7 (10th Cir. 2006), overruled on other grounds by *United States v. Madkins*, 866 F.3d 1136, n. 4 (10th Cir. 2017) (applying commentary to USSG § 4B1.2 even when the "language of the Guideline itself still looks as categorical as ever, but it is apparent that the Commission does not read it that way. If it did, then possession of a listed chemical with intent to manufacture a controlled substance would not be included" because courts are "bound" by the commentary).

ambiguous, a court must exhaust all the 'traditional tools' of construction.[129] If "uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law."[130] Any other approach, *Kisor* now recognized, would "permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation. *Auer* does not, and indeed could not, go that far."[131]

Second, the agency's interpretation "must come within the zone of ambiguity the court has identified after employing all its interpretive tools."[132] To qualify for any deference, the agency's reading must resolve the ambiguity identified in the text of the regulation. And "let there be no mistake: That is a requirement an agency can fail."[133]

Third, "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference."[134] Some "interpretive issues may fall more naturally into a judge's bailiwick. Take one requiring the elucidation of a simple common-law property term, or one concerning the award of an attorney's fee."[135] When "the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority", and deference is inappropriate.[136]

It is technically true that *Kisor* did not directly overrule *Seminole Rock*. But

---

129  139 S.Ct. at 2415.
130  *Id.*
131  *Id.*
132  *Id.* at 2416.
133  *Id.*
134  *Id.*
135  *Id.* at 2417 (internal citations omitted).
136  *Id.*

Justice Kagan's opinion "left *Seminole Rock* looking like Hiroshima after the Enola Gay had flown by. Gone is the proposition that the only two relevant interpretive tools are the text and the agency's interpretation of what that text means. Gone also is the proposition that the agency's construction of a rule is of 'controlling weight' unless the agency cannot read what it wrote. Those propositions were the heart of *Seminole Rock*[.]"[137]

The Tenth Circuit sees the difference *Kisor* makes.[138]  Contrasting its pre-*Kisor* approach with the one it must take now, the Circuit explained that, "the Court in *Kisor* has narrowed *Auer* deference, requiring more rigorous review by courts reviewing an agency's interpretation of its own regulation. We must apply *Kisor's* framework, whatever *Rosillo-Puga* or any other pre-*Kisor* case held…*Kisor* requires that we dig deeper than did *Rosillo-Puga*."[139]  So must this Court.

---

137 Larkin, *Agency Deference After Kisor v. Wilkie*, 18 Geo. J. L. & Pub. Pol'y 105, 122-3 (Winter 2020); *Kisor* at 2425 (Gorsuch, concurring) ("today's decision is more a stay of execution than a pardon… the doctrine emerges maimed and enfeebled—in truth, zombified."); Harned and Van Scoyk, *Kisor v. Wilkie Makes Auer a Paper Tiger*, 20 Federalist Soc'y Rev. 192, 194 (Jan. 2020) ("Both Chief Justice John Roberts and Justice Kavanaugh wrote separate concurrences that emphasized a similar point: there is not much distance between Justice Kagan and Justice Gorsuch's opinions.")
138 *Reyes-Vargas v. Barr*, 958 F.3d 1295, 1298, 1301 (10th Cir. 2020) (Noting that *Kisor* "clarifies when and how courts defer to an agency interpreting its own regulations" and "reaffirmed the general *Auer* rule with three significant limitations on judicial deference."); *Rose as next friend of Rose v. Brown*, 14 F.4th 1129, n. 3 (10th Cir. 2021) (internal citations omitted) ("We've previously regarded the program manual as 'controlling unless plainly erroneous or inconsistent with the regulation.' But our approach has changed under *Kisor v. Wilkie*[.] Deference is now required only if we determine that: the statute is 'genuinely ambiguous' and the program manual's interpretation is 'reasonable,' 'made by' the Social Security Administration, 'implicates its substantive expertise,' and reflects a 'fair and considered judgment.'"); *In re MDL 2700 Genentech Herceptin (Trastuzumab) Marketing and Sales Practice Litigation*, 960 F.3d 1210, 1232 (10th Cir. 2020) (In *Kisor v. Wilkie*, the Supreme Court recently revisited the standards that courts must apply in construing agency regulations.")
139 *Reyes-Vargas v. Barr*, 958 F.3d 1295 at 1307.

### 4. *Kisor* and the Sentencing Guidelines

But the Tenth Circuit has not, yet, examined how *Kisor* impacts the sentencing guidelines.[140]  Some circuits have. The Third and Sixth Circuits have applied *Kisor* to the sentencing guidelines.[141]  The Fourth Circuit issued conflicting opinions less than two weeks apart.[142]  The Ninth Circuit has ducked the issue.[143]

In our view, the issue is straightforward. *Stinson* relied on *Seminole Rock*.[144] *Kisor* dramatically narrows *Seminole Rock*. The Tenth Circuit has explained that henceforth, courts must apply *Kisor's* rule, utilizing the "more rigorous review" it requires before deferring to an agency regulation.[145]  For the reasons identified by

---

140  The First Circuit's opinion in *United States v. Lewis*, 963 F.3d 16, 24 (1st Cir. 2020), mentions *United States v. Lovelace*, 794 Fed. App'x 793, 795 (10th Cir. 2020), as a case that "post-*Kisor*, adhered to prior circuit holdings akin to our own concerning § 4B1.2 and inchoate offenses. But *Lovelace* doesn't even mention *Kisor*.

141  *United States v. Nasir*, 17 F.4th 459, 471 (3rd Cir. 2021), ("we may have gone too far in affording deference to the guidelines' commentary under the standard set forth in *Stinson*. Indeed, after the Supreme Court's decision last year in *Kisor v. Wilkie*, it is clear that such an interpretation is not warranted."); *United States v. Riccardi*, 989 F.3d 476, 485 (6th Cir. 2021) (Should *Kisor* affect our approach to the commentary? We think so for both a simple reason and a more complicated one. As a simple matter, *Stinson* analogized to agency interpretations of regulations when adopting *Seminole Rock's* plain-error test for the commentary. 508 U.S. at 45, 113 S.Ct. 1913. *Stinson* thus told courts to follow basic administrative-law concepts despite Congress's decision to locate the relevant agency (the Commission) in the judicial branch rather than the executive branch. See id.; cf. *Mistretta v. United States*, 488 U.S. 361, 384–85, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). So *Kisor's* clarification of the plain-error test applies just as much to *Stinson* (and the Commission's guidelines) as it does to *Auer* (and an agency's regulations).")

142  Compare *United States v. Campbell*, 22 F.4th 438, 446 (4th Cir. 2022) (applying *Kisor* to the sentencing guidelines) with *United States v. Moses*, 23 F.4th 347, 349 (4th Cir. 2022) ("we believe that subjecting Guidelines commentary to the *Kisor* framework would deny courts the benefit of much of the Guidelines commentary that both Congress and the Sentencing Commission intended courts to apply when sentencing defendants.") Judge King dissented, noting that " The legal analysis of the panel majority in this case conflicts with the *Campbell* precedent in concluding that the Supreme Court's decision in *Kisor v. Wilkie*, ––– U.S. –––, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019), is inapplicable. Crucially, no panel of this Court is entitled to circumscribe or undermine an earlier panel decision."

143  *United States v. Kirilyok*, __ F.4th __, 2022 WL 983181 (9th Cir. 2022) (Noting *Riccardi* but reaching same conclusion on narrower grounds).

144  *Stinson*, 508 U.S. at 37.

145  n. 19, *supra*.

the Third and Sixth Circuits, we ask that the Court refuse to defer to the commentary when sentencing the defendant.

### 5.  The position of trust enhancement

The text of USSG § 3B1.3 directs a two-level enhancement be applied "if the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." The commentary in application note 3 provides that "this adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of public or private trust when, in fact, he defendant does not."

It is clear that Mr. Parcells does not legitimately hold such a position of trust. While he does have some education and training in the area, he is not a doctor and, specifically, is not a pathologist. Left with the plain meaning of the term "position of public or private trust" in the text of the guideline, the government cannot establish that the enhancement applies.

### 6.  Even under the differential *Stinson* standard, the Court should reject application of the enhancement

The *Stinson* standard permits a great deal of deference to the commentary, but it is not entirely toothless. Even under *Stinson*, commentary "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation it interprets."[146] And here, the commentary is inconsistent with the text. The text

---

146 *Stinson*, 508 U.S. at 37.

says we should punish those who hold certain trusted positions in society more harshly than others because of the type of discretion society affords to these positions. The commentary says we should punish those who don't actually hold such positions but feign such a position more harshly than others. These are inconsistent. As the Seventh Circuit explained in *Sierra,* there are legitimate policy reasons to distinguish between the two:

> As we have previously mentioned, one reason for this enhancement is to deter those in positions of trust from committing crimes in which the entrustment of power increases the probability of success or concealment. "With opportunity and a good chance of escaping detection comes temptation, and the punishment is ratcheted up accordingly." Through this sentencing provision, society discourages similar conduct by punishing with greater severity those who use their position of trust to commit crimes. This purpose is served by enhancing the sentences of public servants who abuse the power entrusted to them, regardless of whether criminals feigning the same authority would have increased the likelihood of success of their criminal endeavors. In short, it is irrelevant to our society's desire to deter breaches of the public trust whether an imposter could have enjoyed the same advantages through deceit that Sierra did through his official position.[147]

### E. The potential departure grounds

The PSR has put Mr. Parcells on notice of two possible grounds for departure.[148] Under the guidelines, this Court "may depart from the applicable guideline range if . . . the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C.

---

147 *United States v. Sierra*, 188 F.3d 798, 803 (7th Cir. 1999) (internal citations removed).
148 *See* Rule 32 (h)

35

§ 3553(a)(2), should result in a sentence different from that described."[149] As

described by the sentencing commission in Chapter 1, Part A of the Guidelines

Manual:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.[150]

## 1. Extreme Psychological Injury (Policy Statement)

The probation office has noted that USSG § 5K2.3, Extreme Psychological

Injury, as a potential ground for departure. The policy statement at issue here

applies "if a victim or victims suffered psychological injury much more serious than

that normally resulting from commission of the offense."[151] The policy statement

limits it application to "psychological injury [that] would be sufficiently severe to

warrant application of this adjustment."[152] The policy statement states that the

departure should apply "**only** when there is a substantial impairment of the

intellectual, psychological, emotional, or behavioral functioning of a victim, when

the impairment is likely to be of an extended or continuous duration, and when the

impairment manifests itself by physical or psychological symptoms or by changes in

behavior patterns."[153]

---

[149] USSG § 5K2.0(a)(1)
[150] USSG Ch. 1, Pt. A(1)(4)(b)
[151] USSG § 5K2.3
[152] *Id*.
[153] *Id*. (emphasis added)

In the PSR, Paragraph 242 appears to provide the factual support for this departure, noting that a victim in the case suffered some emotional harm from Mr. Parcells' conduct. But the guideline at issue does not apply to any emotional harm caused by Mr. Parcells' offense. It only applies to "**extreme** psychological injury." As explained above, the policy statement only applies to an injury that causes physical or psychological symptoms or changes in behavioral patterns. While certainly losing money, waiting an extended period of time for an outcome, and the other aspects noted are an emotional toll, they are not uncommon for victims of fraud.[154]

The Sentencing Commission prepared a primer on departures in 2021.[155] In that primer it provided a list of cases where the extreme psychological injury departure policy statement was applied. The injuries outlined in those cases is quite different to the injury caused by Mr. Parcells.[156] The Court should not apply this departure factor.

---

154 *See United States v. Bond*, 22 F.3d 662, 671–72 (6th Cir. 1994) (reversing the district court's decision to depart because, as a result of the bank robbery, "the tellers suffered anxiety for several weeks after the robbery; but this would not be unusual for any victim of an armed bank robbery."), and *United States v. Lasaga*, 328 F.3d 61, 64–67 (2d Cir. 2003) (reversing a departure under this policy statement where the district court did not make the additional finding that the victim suffered much more serious harm than normally would be the case).
155 United States Sentencing Commission, Primer: Departures and Variances, 2021, available at: https://www.ussc.gov/sites/default/files/pdf/training/primers/2021_Primer_Departure_Variance.pdf
156 *See United States v. Hefferon*, 314 F.3d 211, 228 (5th Cir. 2002) (affirming a departure in a child sex offense where the victim's doctor testified that the victim will suffer long-term psychological effects, such as lack of trust—especially of adults—that are excessively severe, and where the doctor indicated that the victim's trauma was the most severe of anybody she had ever worked with), and *United States v. Yellow*, 18 F.3d 1438, 1442–43 (8th Cir. 1994) (affirming a departure where the defendant was convicted of raping his younger brother, who suffered from cerebral palsy, and younger sister, and the record included expert testimony regarding the severity and likely duration of psychological harm suffered by the victims).

## 2.  Extreme Conduct (Policy Statement)

The PSR has also noted a possible departure factor as "extreme conduct" under USSG § 5K2.8. This policy statement may apply when "the defendant's conduct was **unusually** heinous, cruel, brutal, or degrading to the victim."[157]  The policy statement provides examples of conduct including, "torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation."[158]

Mr. Parcells is not alleged to have caused any physical harm to anyone. The primer on departure prepared by the Sentencing Commission provided a list of example cases under this policy statement.[159]  The facts of Mr. Parcells' case are far afield from the facts in those cases. The Court should not apply this potential departure ground.

---

157  USSG § 5K2.8 (emphasis added)
158  *Id.*
159  *See United States v. Wallace*, 605 F.3d 477, 479 (8th Cir. 2010) (per curiam) (affirming an upward departure where the defendant imprisoned and prostituted a mentally disabled young woman and committed such acts as inflicting injuries upon the victim with knives and cigarettes, forcing the victim to drink urine, and forcing the victim to perform acts of bestiality); *United States v. Baker*, 339 F.3d 400, 406 (6th Cir. 2003) (affirming an upward departure in a bank robbery case where the defendant shot a bank security guard after he had raised his arms to surrender, kicked his wounded body until he passed out, and shot him again when he came to); *United States v. Bonetti*, 277 F.3d 441, 449–50 (4th Cir. 2002) (affirming an upward departure where the defendant, convicted of harboring an illegal alien, brought the victim to the United States, and for 15 years kept control of her visa and passport, kept her in virtually slave- like conditions, did not pay her, forced her to work as many as 15 or more hours a day, and the defendant's wife regularly abused her); *United States v. Johnson*, 144 F.3d 1149, 1150 (8th Cir. 1998) (affirming an upward departure where the defendant threatened the victim and a male co-worker with a sawed off shotgun and forced them to disrobe, repeatedly forced the female victim to perform oral sex, penetrated her digitally and with his penis, left her lying naked on the floor, and threatened to kill her if she called the police); United States v. Clark, 45 F.3d 1247, 1252–53 (8th Cir. 1995) (affirming an upward departure in a carjacking case in which the defendant held a gun to the victim's head, traveled around with the victim still in the car, robbed him, and repeatedly told him he was going to die).

**Conclusion**

Based on the § 3553(a) factors discussed above, Mr. Parcells requests this Court to sentence him to a guideline sentence in this case. Such a sentence would be consistent with the § 3553(a) factors but would not be greater than necessary to achieve its ends.

Respectfully submitted,

s/ David M. Magariel
David M. Magariel, #21748
Assistant Federal Public Defender
For the District of Kansas
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone (913) 551-6911
Fax: (913) 551-6562
Email: david_magariel@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2022, I filed the foregoing motion with the clerk of the court by using the CM/ECF system that will send a notice of electronic filing to the following:

Christine Kenney
Assistant United States Attorney
christine.kenney@usdoj.gov

s/ David M. Magariel
David M. Magariel, #21748